We will hear argument this morning in Case 24-1238, Montgomery v. Caribe Transport. Mr. Clement. Mr. Chief Justice, and may it please the Court. When Congress ended federal economic regulation of the transportation industry, it did not want states to fill the deregulatory gap with economic regulation of their own. It thus enacted a preemption clause modeled on the Airline Deregulation Act that preempts state laws related to prices, routes, or services of motor carriers or brokers with respect to the transportation of property. But while Congress favored economic deregulation, the last thing it wanted was safety deregulation. To that end, it preserved federal safety regulatory authority, and it accepted state safety regulatory authority with respect to motor vehicles. My friends concede that state tort law is a classic exercise of regulatory authority and that a principal aim of tort law is safety. Thus, the question in this case boils down to whether the negligent hiring claim here is with respect to motor vehicles. Of course it is. The whole point of the tort is to keep dangerous motor vehicles off of the road. Indeed, my friends concede as much when the tort is directed at a carrier. But that essentially gives away the game, because it's the same tort whether it's directed at a carrier or broker, and it is no less with respect to motor vehicles when it's directed against a broker, who may well know that the vehicles are poorly maintained or the carrier is underinsured or not registered with the federal government at all. Nonetheless, my friends would immunize the brokers in all those situations. That cannot be squared with the plain text or with common sense. Indeed, my friends have to insert words into the statute, like direct link or direct connection, that are absent from the statutory text. This court should interpret the statute as written and not let the brokers off scot-free. I welcome the Court's questions. Mr. Clement, what did the landscape look like before deregulation? And by that I mean who was responsible for the safety regulations? Was it the ICC or some other federal agency, or was it the state? So it was both the federal transportation department or subparts of the federal transportation department at the federal level and the states at the state level. So the old ICC regulated rates, prices, and routes, but it did not regulate safety. And that's really the regime I think Congress— Well, I'm more interested in the safety aspect because I think much of what we're talking about will depend on what it means to regulate the safety of motor vehicles, including the operation. So I'm interested if you would detail the safety regime before the ICC was deregulated. So before the ICC was deregulated— It was eliminated, I'm sure. Eliminated, right. You did have some federal safety regulation from the federal government, but not through the ICC, through the transportation department. But you also had—and there was no preemption of it—you also had state safety regulation. And they could take many forms. They could be positive law regulations that go to safety, everything from speed limits to other provisions, weight limits, maintenance requirements. But you also had these state negligent hiring torts that were applied under the old regime, both against carriers and against brokers. And we cite the L.B. Foster case, for example, from the Ninth Circuit in 1969 in our brief. And that's a state negligent hiring claim that was brought against both brokers and against carriers, and the Ninth Circuit upheld it. And, of course, there would have been no basis before 1995 to even argue that that claim against a broker was preempted, and no argument before 1994 that that claim was preempted against a carrier. One oddity, I think, that you have to deal with is that your theory would mean that claims against brokers would be preempted for intrastate transportation but not for interstate transportation, which seems a bit backwards in terms of preemption. And that's something—if you think the question here is how broadly to read with respect to motor vehicles and you're thinking about context and common sense, which you mentioned, that seems to be in tension with that. Do you want to respond to that? I would love to, because I think there is a counterintuitiveness to the fact that Congress seems to have provided a broader preemption provision for interstate routes, prices, and services for brokers and trade forwarders, and a smaller preemptive scope for interstate. Now, that anomaly is going to exist no matter how you decide this case, because B is broader not just because it doesn't have a safety exception but also because it doesn't have the phrase with respect to the transportation of property. And so a case like Dan City, where this court said that with respect to the transportation of property is what meant there was no preemption, there would be preemption for interstate. Now, I'm not here to tell you that makes any sense. But what I am here to tell you is that Congress in 1995 made a very deliberate decision to treat brokers and freight forwarders differently for interstate and for intrastate. I mean, it would have been the easiest thing in the world in 1995, because remember brokers are added to both a year after the principle statute. It would have been the easiest thing in the world to create like a subsection that was about brokers and freight forwarders for interstate and intrastate. But Congress didn't do that. They consciously had a separate sub-B clause for intrastate, and then they consciously dropped the brokers and the freight forwarders into C, which already had the safety exception. Just going back to the real world, though, a broker in Los Angeles who arranges a trip to San Francisco, no torch suits available. But if it's to Reno, a torch suit is available under your theory. Under our theory of the safety exception. On the safety exception, which is the key. And I guess I'm still trying to figure out how that makes some sense, particularly when let's just add to it the other kind of issue that bothers me a little bit here is the fact that Congress required financial security requirements for the truckers, but not for the brokers with respect to accidents. And that seems another thing that you can respond to. Sure, but let me respond to them in turn. So starting just to reiterate what I said with B, I mean, look, I'm not here to tell you that that's not a little bit anomalous, but it would be more anomalous to take two statutes, one of which has a safety exception and one of which doesn't, and interpret them to mean the same thing. And there's no question that B is not the applicable provision here. C is the applicable provision. And as I said, no matter what you do with the safety exception, you're going to still have an intrastate provision that has broader preemptive force than the intrastate provision because B doesn't have that with respect to transportation. What about the financial security requirement? If we're trying to figure out what Congress was doing, which I think you've talked about here in 94 and 95, they say that the truckers, the trucking companies, have to have financial security so they can pay judgments with respect to accidents, but they don't do that on brokers. And when you combine the two things we're talking about, that does – I mean, that's intentional in your position, but what's your best response to that? Well, I think I have several pretty good responses to that. I mean, one of which is it's even more complicated than that because freight forwarders were also supposed to have some insurance against injury risk. So you can't make some idea that everybody in the sub B is different from everybody in the sub C, if you're following me on that. I am, but if Congress envisioned torch suits against brokers, why not require brokers to have the insurance to pay the judgments? Because I think Congress rationally said, we want to make sure that they have a financial security requirement that is responsive to the principal financial risk that they face. And it's different with respect to carriers than with respect to brokers. The principal financial security risk that brokers have is default. But you can't read too much into the insurance requirements because nobody thinks that carriers can't default. In fact, carriers are defaulting all the time and going bankrupt all the time. And so you can't draw too strong an inference. And what I would also say is there's also sort of an asymmetry in the inference that you would draw. Because, you know, some lower courts, for example, have focused on that insurance requirement by finding that safety torts are not preempted in the Airline Deregulatory Act context. But that sort of makes sense because it would be very weird for Congress to force a carrier to insure against a risk that is actually zero because the risk is preempted. So when Congress says you must insure against something, it's actually a pretty positive sign that there's not preemption. But I don't think it works the other way around. There's all sorts of contexts where you say things are not preempted, and Congress hasn't even thought to make somebody insure against it. So I just don't think, you know, like I don't think there is a presumption against preemption in the express preemption context. But, well, you need something more than an insurance requirement to ignore the plain text of a clause that is designed to deal with the issue of preemption straight up. Can I take you back, Mr. Clement, to Justice Kavanaugh's first set of questions, the interstate, interstate, and you said you're not here to tell us that it makes any sense. Do you have a theory whether or not it makes any sense about how it came to be? I mean, why? I think that, you know, it was a different Congress a year later. Maybe the interest groups lobbied a little different a year later. Maybe the same people weren't paying attention a year later. And, again, though, I think the critical thing, though, is the one thing we can't ignore is that Congress made the deliberate judgment to treat interstate and interstate differently. Now, if you really think they should be the same, then maybe that's a reason to not read the preemption clause to reach safety-related torts altogether, as lower courts have read the ADA. I mean, if the anomaly is really bothering you, that's the one way you can make the anomaly go away. Or I actually suppose, you know, like the text of B is a little bit different, and it's so focused on interstate rates, interstate routes, like interstate services, that you could say that, really, unless you're talking specifically about interstate services, the preemption clause doesn't apply. But, you know, maybe it's best to leave all of that for a case that actually implicates B, because this is a C case, and Congress clearly said, with respect to interstate, at the moment it's creating this new exception for interstate, brokers and freight forwarders. At the same moment, it says, you know what we're going to do? We're going to not treat brokers and freight forwarders the same way for interstate and intrastate, and when it comes to interstate, we're going to drop them into a preemption provision that has a safety exception. I think that's what you have to sort of try to interpret here. And then if you get to the safety exception, I think the question of whether these negligent hiring torts against a broker are with respect to motor vehicles is quite straightforward. And I think if you understand the nature of the 411 restatement tort, the whole reason that there is a negligent hiring tort in certain circumstances, but not others, is because you're hiring somebody to do something that has the possibility of bodily harm to third people, third persons, rather. And what creates the threat of bodily harm to third persons in this context? It's the 80,000-pound motor vehicle that you're putting somebody behind the wheel of or you're entrusting the cargo to. And that's true whether it's a tort against the broker or against the carrier. And so if I hire somebody to just paint my house and they do a lousy job, shame on me, but there's no negligent hiring of a contractor tort in that context, because just painting the house isn't going to pose a risk of bodily harm to third parties. So what really triggers this whole tort is a risk of bodily harm to third parties. And the only thing in this mix that poses that risk of bodily harm to third parties is the motor vehicle. So if you follow what tort we're talking about here, it really does make the connection to motor vehicles quite direct. Ms. Rukuman, could another way of thinking about this really be focusing on C, as you've encouraged us to do, and how it operates, what it's doing? It seems to me that one could conceive of this as C1, Congress coming in and making a change to the status quo. This is the deregulation point that you said. And they say in that section that this deregulation is occurring with respect to the economic aspects of the system. And then the safety clause, this part that we're all focused on now, is really just clarifying to some extent that what they have done with respect to preemption is leaving the status quo regarding safety. And so Justice Thomas' point was a good one. In other words, what was the status quo? States were regulating with respect to safety, so was the federal government to some extent. And if you think of it from that kind of bird's eye view, I think it seems pretty odd for respondents to suggest that Congress was really focused on who would be able to bring a claim or how. It's sort of that's all up to how the state was regulating. What is their tort? What is their system? Congress was just, it seems to me in this statute, saying we're not touching any of that with respect to the preemption that we are now establishing. So I wouldn't resist one word of that. I would say that's exactly how the lower courts have approached this in the context of the ADA, where you don't have a safety exception, so your eyes don't immediately go to the safety exception. But still, courts have realized that long before, like in the bad old days of federal economic regulation, you still had state tort suits for personal injury and the rest. And so when Congress in the ADA says, all right, we want to get rid of the federal economic regulation and we don't want the states replacing it with new economic regulation of their own, but they had no interest whatsoever in getting rid of all those tort actions. And as I say, as we say in the briefs, but I think it's quite true, actually from Congress's perspective, if you want economic deregulation, the last thing you want is a huge uptick in accidents and lots of like safety. Can I just interrupt there just on the rhetoric? It's not getting rid of safety tort suits. The tort suits against the trucking companies, the carriers, are still preserved. Everyone agrees on that. Sure, but the problem is once you agree to that, there's really no coherent reason to stop there. Like you're looking at the state tort, and the state tort is not a – I'm just responding to your point about safety regulation being gone. No, safety regulation through tort suits still exists. Everyone agrees against the primary people who are going to be sued, as I think you've acknowledged, which are the truckers, the carriers. Yeah, and I didn't mean to get carried away with my rhetoric. My point was just like if you're a rational deregulator, but all you care about, Chicago school, you want economic freedom, the last thing you want at that same moment is for there to be new safety problems. And my point was why would we think that given the background that you were talking about, that Congress would be focused on preserving only the tort claims with respect to the truckers as opposed to the brokers, as opposed to anybody else? In other words, why Congress's attention, it would seem to me, would not be at the level of who is actually going to ultimately be sued under tort in these different states or whatnot. The point of its regulation was just to say we are concerned with economic deregulation. Those who are regulating safety carry on. And under whatever state's law, if they have a particular tort, if they had it before, if it's operating, then Congress wasn't bothering that. If it applied to brokers as well as truckers, Congress wasn't bothering that. It just seems odd to me to think that we would read this statute and all that it's doing to have Congress caring about the particular defendants who are going to be sued at the end of the day. Again, I couldn't agree more. And I think if you look at that L.B. Foster case, 1969 Ninth Circuit case, that's a case where the plaintiffs sued the shipper, the broker, and the carrier. And under California law, they were all liable. Now, some other state might make a judgment that we want to stop liability at the broker and not have it go to the shipper. Or another state might say we want to stop liability at the carrier. Maybe a state, I think it would be crazy, but maybe a state wants to stop it at the driver. All of those are judgments that the states get to make. And I don't think, as you suggested — So even if a shipper uses a broker who then hires a motor carrier, you think the shipper is included in this? I do. I think in a sense that's a much more straightforward case. As long as the state tort reaches them, then the shippers aren't covered by the preemption clause. And I actually — so I don't think the shippers have much of an argument. You know, you've got to start with the argument that it's preempted and then resist the safety exception. So the shippers can't get off first base, get to first base, because they're not covered by the preemption clause. And one of the anomalies that the other side's position creates — I mean, you know, they like to talk about the brokers as just being middlemen or middlepersons. But they're middlemen between shippers and carriers who both, at least in some states, are liable for this negligent hiring tort. So it's weird to have the middleman between two people that are potentially liable immune. And if you allow that to happen, it creates a huge artificial incentive for shippers to use brokers. Because that's a way they can try to download — And the other thing they can do is they can actually reinvent themselves as brokers. As far as — I'm sorry. No, I'm sorry. As far as federal law is concerned, how far does with respect to motor vehicles extend? I mean, this is a classic question of causation. Does it extend to anything that could contribute to an accident? So I'm not sure that it, you know, sort of goes, like, to, you know, the butterfly effect and all of that kind of thing. What this Court has said in lots of contexts is it doesn't have to be, like, super direct. There's no direct link requirement. But at the same time, things that are attenuated, peripheral, and remote, I think is the phrase this Court has used on a couple of occasions, are not covered. Now, here, I think it's a pretty easy way to say that this is not wildly indirect for — Yeah, no, I see that. But do you think there is some limitation in this phrase, with respect to? Absolutely. But I would say, like, if I were, like, sitting on Congress's shoulder and saying, all right, we want direct connections only, I would say don't use the with respect to language. And the limitation is proximate cause under state law. Is that the limitation? Well, that's one practical limitation in this context, because you can't bring a court against a broker under state law unless you satisfy the proximate cause requirement. Yeah, well, I understand this is pretty direct. But if something has to be — some kind of directness requirement or a minimum link requirement has to be read into C-2, then I come back to the question that Justice Kavanaugh led up with, which is the real anomaly, which is very hard to accept, that there's preemption for intrastate activity but not for interstate activity. And I came to the argument hoping you were going to give us some brilliant way of reconciling these two provisions, other than just live with it. But I guess there is no such theory. If there is, it has escaped me. But as I say, I do think it's telling that you are going to have a broader intrastate preemption clause, no matter how you decide this case. The other thing is, I would say, I don't think — I mean, that would really be letting the tail wag the dog. You know, I've looked through all these cases. I think there are two intrastate cases that I've been able to find. Maybe my friends have found more. But there are, you know, dozens and dozens of intrastate cases. And the intrastate cases I've found have actually said there's no preemption on sort of the ADA. That's not what this is all about. So I think it would be a mistake to let the absence of the safety exception in B be the tail that wags the dog. What do you do with the fact that the brokers — I think the amicus brief of the Transportation Intermediaries Association, particularly pages 20 to 24, really go in detail of if tort liability extends to them, how are they going to assess and evaluate the safety of drivers in a particular trucking company? How are they going to figure out do they have an alcohol or drug issue? How are they going to figure out English proficiency, which, of course, is a critical issue at the current moment that's being discussed? How are they going to do this is the real concern that's raised in that brief and by respondents that I think, you know, is something you need to respond to. Sure. I'll try to respond to it. And I think it may be much more straightforward than you think in many cases. I mean, ultimately, like the legal answer is it's the no or should have known standard. But usually when you say that, sorry to interrupt, you know, there's some way for the tortfeasor to protect themselves. And what they're saying here is in the real world of how brokers operate, it's very difficult. So I think it's going to be pretty easy for them to protect themselves by hiring quality carriers. And that's going to favor them. So this whole thing is going to really favor the large established carriers over the smaller carriers because they're going to default to that to protect themselves, I think, which is fine. But I just want the implications of your position to be understood. Look, you can be a safe small carrier. And here's the thing. They tend not to be as safe as the larger ones, correct? Well, some of them tend to be very unsafe. And some of them tend to be these chameleon carriers where their safety record is terrible. And then they show back up. And the situations where there should be liability is when the broker knows or should know that it's a chameleon carrier. If they've just been dealing with this carrier as Joe's Trucking run by Joe Smith and then all of a sudden Joe Smith shows up and this time it's Smith Trucking, like the carrier is going to know that or the broker is going to know that. And here's one of the things that sort of helped me understand all of this, which is you have a number of situations where there is a captive carrier where that carrier does only loads for C.H. Robinson. And so in that circumstance, C.H. Robinson is going to know every bit as much as the carrier is going to know in those circumstances. Now, there are going to be other situations. Like I said, they can protect themselves. But they can also protect themselves by asking some questions and having some screens. I mean, this is a case where C.H. Robinson's own policy says that they don't hire carriers that have conditional safety ratings, but they did it here anyways. So, you know, you have cases like that where, yeah, you can worry a little bit about how they're going to protect themselves, but they already take some efforts. And when they blow their own sort of standards or like... Well, they're relying on the federal government standards because the federal government regulates the trucking companies and kind of certifies them. That's probably not good enough is what you're saying, which I don't disagree. I'm not taking issue with that, but that's what they've been relying on in the past, right? But the federal government regulates in a very minimal way and the federal statute specifically says it's a minimum, not a maximum, and states are free to go above that. And, I mean, you really can't underestimate... Again, for the carriers, that begs the question, but keep going. I mean, you know, the statistics that the amicus briefs have shown is that roughly 94 percent of carriers have not had like a safety exam by the federal government. And the way this works is to get on the road in the first instance, you do not have to go through some... I mean, it's kind of less rigorous than getting your state driver's license for a car. Thank you, Counsel. Justice Thomas, any further? Would you take a minute and walk me through why you think or why it's agreed here that subsection 2 regulates safety in intrastate cases? So, oh, the argument would be that, you know, if this were a B case and I was trying to argue that safety is not preempted, what I would do is I would make an argument sort of like I would make in the airline deregulation context, which is to say there were these tort claims beforehand. They probably, like, the last thing anybody would have thought was going to be preempted beforehand was an intrastate tort claim. And all Congress was trying to do with B is to make sure when they deregulate intrastate that there aren't these sort of confusing intrastate regulations of the same economic things. So that would basically be my argument. You know, I could warm to it and try to get a little more textual and try to say that, you know, it's written a little bit differently and it really does focus on intrastate rates, intrastate routes, intrastate services of any freight forwarder or broker. And it's just a little hard to think of these, like, negligent hiring things as being sort of like distinctly intrastate. But it's a harder case than C. I'll grant you that. Was there ever any federal involvement during the ICC era with intrastate shipping? No, that was, I mean, except in one or two areas where they felt like they had to do it to rationally regulate intrastate. But under the old ICC, the basic division of labor was interstate federal, intrastate state. So why would this have any application at all just structurally to intrastate shipping? If the deregulatory effort is to deregulate covered areas and this area was not intrastate, why would it have any application at all? Oh, I'm surmising now. But I think the idea was, okay, like in a world where everything's regulated at the federal level, it's pretty easy to sort of hand off, like, regulation to the states when it's intrastate. But in a world where you really want the free markets to sort of prevail, having this little island of state economic regulation of intrastate starts to seem like less wholesome and it's sort of interfering with the federal objectives. And in this regard, it's probably worth recognizing, you know, the federal deregulation takes place in 1980. They don't impose the preemption provision generally until 94, and then they don't address brokers and freight forwarders until 1995. So for 15 years, the federal government was perfectly happy to deregulate at the federal level and let the states kind of do what they want. And then at a certain point, I'm surmising that they said some of the state regulation is getting in the way of our federal economic deregulatory objectives. But at the same time, you know, in the two places, because they did it for passenger too, they really did try to preserve state regulatory authority with respect to safety in motor vehicles. Justice Alito? Justice Sotomayor? I paused when I was reading the briefs in this case. Is the intrastate preemption subject to challenge? Because if it's been decoupled from intrastate commerce, under what congressional power could the government preempt? I'm guessing. I mean, it's probably a pretty good question for the federal government. If I had to make the argument for them, I would say that it's under the Necessary and Proper Clause, and it would be under the theory that they needed to regulate the intrastate in order to rationally deregulate the intrastate. But I guess I'll take the question as a friendly amendment. It's just one more reason to leave the intrastate provision for a case where it's actually at issue. Because the one thing that's crystal clear here is they have no B argument. This is intrastate. Yes, and I do understand what you're saying to Justice Kavanaugh and Alito, which is the difference between intrastate and intrastate is even wider than whether you cover brokers or not. Because intrastate, they're preempting everything, not just whether it's in transport or property.  And, you know, like if I were going to warm to the topic of having to have a theory of how all this works, I suppose if what they were really trying to do in 1995 is make sure that the state regulation sort of doesn't interfere, maybe they just address it a little bit differently. Could I stop you to go back on the shipper question? Because one of my questions in my mind was, how far back can you go? Could you go to the shipper? And you're saying in many states you can. Would that be for hiring a negligent carrier or for hiring a negligent driver? Is the liability automatic for the shipper? So under certain circumstances, and I think the most circumstances, it would be for hiring a negligent carrier. But I think it also could get to the driver level. I mean, I think, you know, in a case like this, like, you know, and this happens more frequently than you think. I mean, I think one of the other statistics in the amicus brief is some 50 percent of all carriers only have one driver. So particularly if you're a broker, you may very well know not just what carrier you're getting but what driver you're getting. But your point is that the shipper would not be preempted under any circumstance. So this lawsuit doesn't have a defense under this act if you're suing the shipper. If you're suing the shipper, that's right. Now, there is an amicus brief here that's, you know, two actually, I think, on behalf of shippers that are making what I think is kind of an extravagant argument, that they are covered by the preemption provision even though it obviously doesn't address shippers and it only addresses carriers, brokers, and freighters. Do you happen to know if there are lawsuits against shippers that go on routinely? My understanding is that there are. But my understanding is that, you know, it's also caused some shippers to start using brokers because it leads to a colorable, textual preemption argument to use a broker. Thank you. Ms. Kagan? Mr. Clement, the government has an argument, I think it's the government, might be the respondents too, that your theory makes this with respect to motor vehicles phrase superfluous. I was just wondering what you would say about that. I was hoping you would ask. So I think there's a big problem with that argument because I think it sort of fails to appreciate how broad the definition of transportation is. And the statutory definition of transportation that's relevant for this part of the statute is reproduced at pages 18 and 19 of the petition, if you have that. But it's an incredibly broad definition, and it's 23A. And the first thing in the definition is a motor vehicle. And then it then goes on to list ten other things, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind. And then there's a B clause that goes on and talks about services related to movement, including receipt, delivery, elevation. I had to look that one up and figure it out. They're actually talking about grain elevators. Transfer and transit, refrigeration, icing, ventilation, storage, handling, packaging, unpackaging, and interchange of passengers. So there is an enormous amount of things that come within the broad definition of transportation that do not involve motor vehicles. So there is no superfluity problem here at all. And I would say that the breadth of that definition of transportation is maybe one more reason to think that maybe you should decide this case either just on the safety exception, or maybe you should say the preemption clause doesn't apply here at all to safety torts, a la the lower court handling of the ADA cases. Because if somebody gets injured on a wharf or a pier or a dock, there's no way that's with respect to a motor vehicle, or it could certainly not be. And it would be pretty weird if that were preempted. But, of course, the old ICC had a pretty broad sense of what it got to regulate, including the routes and charges and services for, like, a grain elevator. So I do think there are real reasons for caution here. But I'm glad you asked the question because I do think the more you appreciate the breadth of the statutory definition of transportation, the less persuaded you would be by that superfluity argument. Thank you. Justice Worsitch? Justice Kavanaugh? If you prevail here, I just want to pick up on what brokers will need to do. So you prevail here in your counsel to a broker, say, and the broker is worried about, you know, the issue the Wall Street Journal focused on yesterday, the English language proficiency of drivers who can't read signs. Okay? And so the broker says, I don't want to select a carrier that hires drivers that are not proficient in English language. How do they do that? And do they need to do that? And how do they do that? Because that's a lot of the current discussion is there are a lot of different issues, but that's one that's currently in the current events. So complicated question. I'd probably give them a pretty long memo. And, you know, I'd start by saying I'm not sure these, like, English language requirements are really sort of safety regulations with respect to motor vehicles. Maybe they are. But, like, I think that's a debatable question sort of at the threshold. Well, why not? If you can't read, if you're hiring drivers who can't read the signs, that seems like a safety issue. If you say so. Assume that's true.  Assume that's true. Then I want to address whether, like, I'm violating some other federal law by discriminating on the basis of English language proficiency. And I haven't sort of thought all that through, but it's not obvious to me that you can do that. But assuming you can. Well, the federal government now tests for that for the drivers. Yeah, I bet that's being challenged somewhere. But let's assume that, you know, we're on to the last part of my memo. We'll assume that that's also legal. Then I would say, okay, like, you can use large carriers. But if you do, make sure that they have an adequate testing program. And if you do, you're done. And the carriers will have every incentive to have that themselves because everybody thinks the carriers are liable. So if we don't have problems with the two threshold questions, then the carriers are going to have to do it. So the broker should be in a pretty good position. They just have to hire carriers that actually have a reasonable policy for dealing with that. And if they want to have smaller carriers, that's great. But they just need to. Same for, let's say, drug use. They're asking the carriers, what do you. They've got to get something from the carriers that say we're checking our drivers for drug use, alcohol background, safety checks, prior accidents, all that. Right. But what you don't want them to do is not even ask that question and then hire somebody who's cheaper. Because one of the reasons I think that you do want them to have to have some duty of care in these circumstances is this is a margin business. So if they don't have any sort of incentive to internalize any of the cost of not asking the question, they really have no good reason to ask the question. They want to hire the cheapest carrier. So the real world effect, again, and I think this may help your position so this is not a hostile question, is the brokers are going to be really digging into the carriers' safety background checks of drivers if you prevail in this case. And I don't think you should shy away from that. I just want to make sure that's what you think is going to happen. Yeah, but, you know, I think I worry a little bit about digging into because. . . Well, they don't want to get sued for millions of dollars, so they should dig in, shouldn't they, if you're their counsel? I'd tell them, if they're counsel, I'd probably say out of an abundance of caution, dig in. But I would also say I wouldn't be alarmist about this because the carriers, everybody agrees the carriers are going to have to do this. And so as long as you're not hiring fly-by-night carriers who aren't doing it and have the minimum $750,000 of insurance. . . And you can hire small, you can hire, you know, small is beautiful if they do it right. But you do have to sort of ask those questions and make sure that, you know, they're in a position where they're doing everything they can. And then if you do that, I would think the broker is not going to have a problem if it's asking the hard questions of the carrier. Thank you. Justice Barrett? Mr. Clement, assume that I, and this is just an assumption, assume that I think C-1 doesn't apply and it's not preempted. What would be the advantage of deciding this case based on the safety exception rather than the preemption provision? So the principal advantage of deciding this case on C-2, on the C-2B or whatever it is, like that might not really move you if you actually don't think it's preempted under the principal preemption provision. But the principal . . . I said that backwards. I mean, say that I think you might win under C-1 because I don't think it's preempted. Why would I decide it? Or is there any reason to decide it? Under those circumstances, there's not much. But I will say this. Like, you know, I think the question about whether the ADA preemption provision applies to safety-related torts is a hard one. And I think anything you say about the principal preemption provision here is, I think, going to have some carryover effects in the ADA context. That's, after all, why the Airlines for America filed an amicus brief urging you to sort of decide it that way. And I think you might want to hold that issue, which is a tricky one, harmless. And the way you hold that issue completely harmless is save it for another day when it actually matters, and you just decide this case on the basis of text that's not in the ADA. Okay. Let me flip it. Let me say that I am very . . . I do think it's a hard question. I'm very skeptical about whether the preemption provision applies or not. Is there anything that . . . and let's say that I think that you win under the safety exception. Is there anything that an opinion might say about the safety exception that might prejudice that question when we confront it later, the preemption provision? I don't really see how it could because it's text that's not in the ADA. And I suppose everything I'm saying about the ADA would also be if you ever do get one of these B cases and, you know, with intrastate, that would be another thing that you're not prejudging if you decide this case just based on the text of the safety exception. Same on C-1 because the text is the same in the ADA. Yeah. Yeah, exactly. Exactly. Justice Jackson? So I guess I'm still struggling to see how the policy concerns that you explored with Justice Kavanaugh really are being addressed in this statute. I mean, this is not a liability statute as I see it. It's not setting up a cause of action for any kind of trucking accident. It's leaving it to the state. So the concerns about the extent to which the brokers are involved in this or will, you know, other kinds of defendants or how much liability, don't those come out state by state depending upon what claims are being made as you read this statute? No, I mean, that's absolutely true. And, you know, you have an amicus brief from 28 states, and they pulled off the incredible feat of having California and Texas on the same amicus brief. And, you know, that shows there is a lot of variety in the state tort laws. And I think, you know, there are a couple of states that don't have this tort. But it does go all the way back to the first restatement, and most states, the overwhelming majority of states have this tort. And the ones that don't, then the brokers in that state wouldn't be held liable for them. Or all the arguments about, like, how do we do this seem like they'd be made to the state legislature who's trying to hold them liable. It's not in this statute, I think, because it doesn't suggest to me, looking at this text, that Congress was focused on the result of this other than to say we are preempting with respect to race, et cetera, et cetera. Can I just ask you one more thing? The government is focused a lot on the definition of motor carriers that is in this statute. And I guess I'm wondering whether that really matters from the standpoint of how we understand your arguments related to C. Is this turning at all on us focused on the definition? I thought this was about, in your view, with respect to as opposed to the definition of motor vehicles. Right. There's a couple of things there. I mean, which is to say, you know, there's some focus on the definition of motor carrier or motor vehicle. But, like, I don't think any of that matters here for the reason that you said, both, that we're really thinking about, like, the state judgment, whether it's a state judgment about safety. And then at the same time, like, nobody doubts there's a motor vehicle here. So it doesn't matter. We don't have to focus in resolving this case on the definition of motor vehicle, in your view. I don't think so. Like, nobody really disputes that there's, like, a motor vehicle at the center of this case that caused, you know, great injuries to my client. So the only question is, is sort of the state safety regulation sufficiently closely related to that motor vehicle? And as I've tried to explain, it really is quite closely tethered, because the whole reason you have a negligent hiring tort is because you're talking about something that poses a danger of harm to third parties. And the thing that poses the danger of harm to third parties in this context isn't some brokerage form. It's the 80,000-pound truck. Thank you. Thank you, Counsel. Mr. Bouchos. Mr. Chief Justice, and may it please the Court, Congress assigned freight brokers a defined role to arrange for transportation of property by connecting shippers with motor carriers. Petitioner's tort claims target that core service, so the claims are preempted. The only real question here is whether these claims are saved as the safety regulatory authority of a state with respect to motor vehicles. They are not. Brokers lack sufficient connection to motor vehicles. Brokers don't own, operate, or control motor vehicles. Text, context, history, and precedent confirm this. A few examples. First, the Savings Clause uses the phrase, with respect to motor vehicles, which in this Court's words in Dan City, is massively limiting. And it implies specifically only to motor vehicles. The definitions do matter here, not transportation of property, which is much broader by statutory definition. Second, subsection B expressly preempts state law claims related to intrastate broker services and has no savings clause. It is unthinkable. It's absurd that Congress would have saved states' authority to regulate interstate, but not within its own borders. Third, Congress required only carriers to insure against personal injury liability for motor vehicle accidents and only required brokers to have insurance for freight charges. And that mirrored what the ICC said just a few years earlier, that brokers were not responsible for personal injury damages. It was the expert agency. Finally, this isn't a deeply rooted tort. We challenged Petitioner to find one single negligent selection case involving a federally licensed broker in American history and at common law, and they came up empty. It didn't start until 2004. Petitioner's asking this Court to disrupt the uniform federal regime by greenlighting new state law duties even more onerous than the special checking system that the Court said was preempted in Roe v. New Hampshire Motor. I welcome the Court's questions. If brokers are as attenuated in the process as you say, wouldn't they fall out in a tort action from a causation standpoint, proximate cause standpoint? Only after a great deal of litigation. And what happens in these cases is the brokers are now named automatically. And if you look at the complaint, it's all information and belief. This notion that the company violated its own policies regarding conditional rating, information and belief. They do this in every case. It's basically strict liability claims against the brokers for having connected the shipper and the carrier. And so after a lot of litigation, the burdens are tremendous. C.H. Robinson is a big company, has many, many of these cases pending when it did nothing wrong and when the drivers and the carriers did nothing wrong. So it burdens interstate commerce. And Mr. Clement was arguing for a patchwork, the very patchwork that Congress intended to end of states imposing their varied standards. But you mentioned that you can't find cases from an earlier time. Isn't that a part that brokers are playing a more pronounced role now than they did in the past? Well, my client's been around for over 100 years. Brokers have been involved all along in the process. I love the L.B. Foster case that Mr. Clement banks his whole case on. It was a 1969 case involving a shipper. The broker was not an issue on appeal, who had hired an unlicensed broker, so there was a broker involved, and an unlicensed carrier. That's the best they could do. There wasn't a federally licensed broker or federally licensed carrier involved. His restatement example, Your Honor, he wants us to ignore what the ICC said in 1987, that brokers are not responsible for personal injury liability, and assume Congress knew that in 1934 the restatement cited a case about a hotel concierge whose omnibus was broken, so he hired someone else to take people to the train depot. That's the history he's relying on. The reason there isn't a history on this, Justice Thomas, is that the ICC and the federal regime was viewed by the states and by this court in Castle as being the entity that says whether carriers could traverse in interstate commerce. So there were no states could not deem a carrier or a driver unfit. That would thwart the federal licensing regime that existed then and that exists now. What was the treatment by the ICC of intrastate shipping, purely intrastate? And there were certain products that were not covered by the ICC. How were those treated? I think what the ICC would have probably captured those in its regulation to the extent they were within the chain of interstate commerce, and this goes to some of the questions about Section B. I do think the quote from Mr. Clement that he has no answer, no idea why Congress would have had preemption intrastate be complete with no saving clause, but to have saved these claims interstate. But I think that to the extent that in the chain of interstate commerce, and this goes to Justice Sotomayor's question about constitutionality, I think there is a connection between purely intrastate activities and interstate commerce in some instances. The other point I wanted to make is the briefs in Mr. Clement today really hammer on this notion that Congress was looking at economic deregulation and safety, of course, it was not touching. It clearly cared about safety. The FMCSA, the expert agency that now exists, has enormous federal power over safety and writes 700 pages of regulations and it's in a partnership with the states who endorse, I think most if not all have endorsed the safety standards of the federal government. Yes, it cared about it in the way that you're talking about, but really the relevant focus I think needs to be on what it was doing in this statute. And what concerns me about the way you've set this up is you are suggesting, I think, that the preemption part of this was also covering state regulations with respect to brokers as they relate to safety and that then when Congress came in and put in the savings clause as a part of this, it was leaving brokers preempted with respect to what they do that might implicate safety. But that's not the way I think the statute reads. It seems like the preemption is smaller than you're giving it credit for to begin with. The preemption is very broad as, again, Mr. Clement kindly outlined. Transportation of property, that's what's preempted. No, no, no. Laws related to a price, route, or service of any motor carrier. Or broker with respect to transportation of property. But I think what's doing a lot of the work in this in understanding the scope of preemption is the states may not enact or enforce a law related to a price, route, or service. And if you read it that way, then the savings clause is focused on what the state can do concerning safety. Well, it is, Your Honor, but it's safety with respect to motor vehicles. In the preemption clause, everyone, we're not disputing that a tort claim that targets the services of the broker. And this goes to the essence. As the Seventh Circuit said, as Aspen said in the Eleventh Circuit, this is the essence. What brokers do is match the carrier. Counsel's depiction of what brokers do is completely divorced from reality. They're not interviewing and investigating. They're matching up federally approved carriers with shippers. And they want them to be safe because they want their shipper clients to keep hiring. There's no duty of the broker to check the safety records when it's doing that match? No, Your Honor. In fact, they can rely, they're supposed to rely on the Federal Government's licensing. That's what the Court said in As a matter of state law, the state could not impose a duty on them to make sure that they pick and match the best in terms of safety records? That's exactly the question in this case, Your Honor. And if you look at the complaint, JA 23 through 22 through 26, they're asking this Court to green light the states to impose duty after duty. What was the status quo? Was the state able to hold a broker liable before this action, before the preemption, for things like what is happening in this case? No, Your Honor. We don't believe they were. We think this Court's Castle decision talks about how the states could not second guess the Federal authorization of a carrier because it would thwart uniformity, it would thwart commerce. This isn't a traditional area of state prerogative. This is about interstate commerce and the free flow of interstate commerce. Mr. Boutrous, this might be a good idea, this might be a bad idea. I mean, maybe this is just a simple-minded way of looking at this, but I'm just looking at this provision, and it says shall not restrict the safety regulatory authority of a state with respect to motor vehicles, and you agree that these tort actions are part of the state's safety regulatory authority, so then the question is whether these suits are with respect to motor vehicles, and, you know, come on, how could they not be? They're all about getting good drivers behind the wheel of a massive truck. That's with respect to motor vehicles. Now, Your Honor, I think it's actually a good way to look at it because, first, the definitions matter here. Congress, when it added brokers and added Subsection B, which has no saving clause, it didn't change the saving clause, the safety saving clause. It didn't broaden it to transportation property. It kept it focused on motor vehicles. Motor vehicles are very narrowly described as the tractor-trailer, the truck. Okay, but the motor vehicle is the truck, and these suits are all about the trucks. And who's driving the trucks? And I go back, again, Petitioner did not mention this Court's two leading cases. The Dan City case, this Court said with respect to transportation of property, which, as Mr. Coleman said, is really broad, that that massively limited the scope of preemption. Could the states say you can't drive a truck unless you're 16, unless you're over 21? I think the states could have. Oh, so that's not with respect to the motor vehicle. It's with respect to the driver who's going to drive it. Can the states say truck drivers have to wear seatbelts? That would be compatible with federal law, Your Honor, and they could do that. All right. So what's incompatible with federal law with respect to safety to say you shouldn't operate this if you're a careless negligent driver? The states could say that. What they can't say is that a broker can be held liable. Why not? Because the broker is the one putting the driver in the seat of the motor vehicle that's causing the accident. That's not correct, Your Honor. That's another real, I would say, not accurate depiction in the briefing here. Wait a minute. Yes. The broker hires the company who's going to transport, says the company is negligent because it's had, I think, two or three accidents in the space of a month. Drivers have, and it only has nine trucks. And it has a driver who just that month had another crash where he was found negligent. I don't see how someone hasn't failed in their duty. Yes, Your Honor, that would be the carrier and the driver. The broker doesn't know all that. Well, then that's a defense, counsel. It is a defense, and it's also why they're negligent. But it's not, it doesn't answer the substantive question of whether it could be held liable if it had a way to check. If it was required to check this special checking system, and I go back to Roe where this court said that the main statute there that would have required the carriers to check to see if the packages were going to be directed to a minor shipping tobacco, that that would have imposed this patchwork and would have imposed this extra duty on the services of the carriers. Safety regulations always create a patchwork. No matter what the safety issue is, there's going to be different state requirements, and so the patchwork exists just because of the exception. But can I address that, Your Honor, because Section 31141, which both parties cite, seeks to eliminate that. It gives the secretary pretty broad power to preempt after decision. So while the states can enact their own safety regulations, they must be compatible with federal law, consistent with federal law, even if they're stricter, and if they burden interstate commerce because they create a patchwork. Because, and we're talking about driving through multiple states. Here it was Ohio, Texas, and Arkansas, I think. And so you need to have the certainty that you can traverse those jurisdictions. On the with respect to motor vehicles phrase again, going back to that, obviously motor vehicles are involved. I thought your argument was you have to figure out how broadly to read with respect to, like relating to, it could go forever or where do you cut it off. And I guess my question is, given the safety implications, why would Congress have wanted to cut it off at carriers and not include brokers when I think, although they haven't traditionally done it, brokers could do more to ensure that carriers are hiring safe drivers who don't have issues with their history or whether they can read the signs or whatever it might be. And that will reduce the number of fatal trucking accidents, which is a huge problem. Why is that not a reasonable way to read it? I think that what Congress did was ensure that brokers could allow for a seamless interstate commerce. If it imposed those obligations, it would just completely bollocks up the broker duty. They would have to investigate whether the driver was fit. This is just right from the complaint. The carrier was fit. They'd have to investigate the driver history and ask for that. Well, how will that happen? Will they demand from the carriers, give us information about who you're hiring? I assume that's what will happen if you do not prevail in this case. Right. That could be done, though, right? It could be done. But these things happen quickly. This is about matching carriers who are on the road with shippers' demands to get things there just in time. And it's become a crucial part of interstate commerce. And I do want to go back, Your Honor, if I can, on the interpretation of the language. We do believe that with respect to motor vehicles is the crucial question here. And one thing we haven't heard – I'm sorry to interrupt you there. So you agree with respect to motor vehicles and safety regulations. It accounts for the safety belt regulation. It accounts for age limits and things like that. You agree that it also permits a hiring tort suit against the carrier. Do you agree that it also permits a tort suit against the shipper? We do not agree with that, Your Honor. So it stops with the carrier and only the carrier. Exactly, Your Honor. And that's not to say there isn't rigorous federal enforcement. There are criminal provisions. Why not the shipper? The shipper, by imposing that duty on the shipper – and there are lots of claims against shippers. The shipper, by imposing that duty – this is like Roe. If you impose that duty on the shipper, then they're going to make different choices with respect to motor carriers. They're not going to allow new entrants. That will have an impact on the services of the motor carriers. And that's sort of how the Court analyzed it in Roe. So I think it would burden them tremendously, and it would basically – It's really a causation argument. You're saying it's just too far removed. It's a proximate causation argument. It's related to it, but I think it proves our point. We all know – If it's a causation argument, I guess I'm back to where Justice Thomas is. I understand the burden of these lawsuits. I appreciate that. But to the extent your argument hinges on causation, that is built into the state tort system in these cases. I suppose if there weren't a proximate cause element that's required, that might be a matter of some consideration. But there is. The problem with that is it is baked into the state system. And they want to be, in the words of the Ohio brief, laboratories of democracy. They're going to have varied standards. They're going to create a patchwork which would cause brokers and shippers and – Well, right now we have a proximate cause standard before us, right? In this case. Well, that's because petitioners are asking the Court – Petitioners are asking this Court to assume Congress is thinking about proximate cause. It was thinking about – I'm asking about the claim in this case, is a proximate cause – Yes, there is. But the problem is it's a nebulous concept. And I go back to the definitions in respect to motor vehicles. Motor vehicle safety is defined as the performance of a motor vehicle in a way that protects the public interest against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle. So when Congress used motor vehicle with respect to motor vehicle, it was, in this Court's words, massively limiting the scope of the saving clause. And here, the brokers are too far removed. They can't – they don't touch the vehicle. They don't control it. They don't know what vehicle is going to be used. They don't know who the driver is. But they're performing a function relying on the federal authorization and licensing, which is what Congress intended. And so I think it's really important. And on the federalism point, I think the Nebraska brief points out that under this regime, the state with the most plaintiff-generous tort principles and proximate cause principles, they'll rule the United States. Everyone will have to adhere to those standards or avoid that state entirely. And that's why Congress felt that preemption was important here. How difficult is it for a carrier to be authorized under Federal law? It's not nearly as easy as Petitioner is suggesting. Again, I think the regulations and the statutes speak for themselves. They have to show that they're fit. They have to show that they meet the various standards, that they will agree to hold drivers to certain standards. They do audit carriers. A lot of these complaints, we disagree with them about the FMCSA. But if that's a complaint, well, then they could do more or go back to Congress. And going back to the insurance point, yes, some carriers don't have significant insurance. Do the Federal authorities insist that someone who's seeking authorization show that they've done background checks on drivers, that drivers can read signs, that drivers don't take drugs, don't have a history of alcohol abuse, any of the things that would contribute to a real safety threat? They're required to do that and accomplish those goals to get Federal licensure. If they don't do it, the FMCSA can take away their license. So there's a rigorous system. Thank you, Counsel. Justice Thomas? I think I alluded to this before, but has there been an increase in the role of brokers post-deregulation? There has been, Your Honor, and it's contributed greatly to our economy and to commerce. How significant? Significant, Your Honor. No, I mean how significant has the increased role been? I think back before deregulation, there were less than 100 brokers, and now there's thousands. Most of them are much smaller than C.H. Robinson, which is another reason not to impose these brand-new duties. Ms. Leano, anything further? Justice Schwartz? From there? There's, amici says somewhere between 6,000 to 9,000 motor carriers registered with the FMCSA every month. You're going to tell me that they have the resources to check every one of those new entrants and all the existing ones to see whether they're following the rules? They require that the carriers swear they will perform. I am asking you, do you believe the agency has anywhere near the resources necessary to adequately vet all of those applicants and keep on top of the operation of the people who already are licensed? It's a significant task, Your Honor, and probably not. They couldn't do it with respect to everyone. So Congress did one thing. It exempted motor vehicle safety. You still haven't given me a reason in this context why, with such a capacious word like with respect to, that we should read it narrowly instead. Your Honor, in the spectrum, related is the gold standard for breadth and preemption. With respect to is used next to related in Section C.1. So Congress clearly was thinking of it differently. This Court, in cases like Presley and Lamar, which the 11th Circuit cited and the Chamber of Commerce brief cites, this Court said with respect to means direct relationship to or impact on. And here, to hold someone liable for negligence with respect to a motor vehicle where they had no ability to control it or inspect it, in those duties that, Your Honor, the big group of carriers, now that would be imposed on these brokers who aren't safety experts. We'd have to hire an army to do what they're asking the Court to greenlight. Justice Kagan? Two things. You said it started in 2004. Why? Because the creative plaintiff's bar decided to start bringing these cases against brokers and to establish, bring them into the case to have additional targets. That's what's really ironic here, the notion that Congress, when it preempted claims against brokers. Because some of the carriers couldn't pay? I think some of them couldn't pay or they wanted to have additional potential defendants. And so they're not asking this Court to restore or protect longstanding state law. They're asking this Court to authorize the states to become laboratories of democracy, to creatively adopt a patchwork of new duties that will really hamper interstate commerce and defy Congress's intent. And then you've had, I think, law against you in the Ninth Circuit since 2020. And you've talked about, oh, this would be difficult to impossible. What have brokers been doing in the Ninth Circuit since 2020? Because I assume they have adjusted their behavior in response to that and Sixth Circuit as well. Yes, they've been litigating because they're getting sued still repeatedly. Are they changing their practices at the front end so they're not liable at the back end, given the Ninth Circuit and Sixth Circuit law and the possibility that that law will stay the law? They have not made the radical change. Waiting for a ruling from this Court to clarify that these claims cannot be recognized. But in California, the effect has been mitigated a bit because two state courts of appeal have rejected the Miller decision and gone with Judge Fernandez's dissent in that case, which I think really just very in simple terms outlined this. This is a step too far. I think the Eleventh Circuit said a bridge too far. To hold someone liable for who matched the carrier in the – I'm puzzled that no one's – I mean, I'm not saying you know everything that's going on out there, but I'm puzzled that brokers haven't started doing more on the theory that they could be held liable. Wouldn't they change their behavior with some bad law? Well, the problem is they get you coming and going, because if you do more, then the argument is – like in this case, you're precariously liable because you had control. So if you don't do enough, they say you should have inspected like you were the federal agency. If you do too much or you do anything, they say you're in control, which is just not true. The broker is a broker. They're a middle person, matchmaking, so commerce can flow. Justice Barrett? Justice Jackson? Thank you, Counsel. Thank you, Your Honor. Mr. Joshi? Mr. Chief Justice, and may it please the Court, I think if you look at the phrase with respect to motor vehicles in isolation, Petitioner has a pretty good point about how to interpret just those words in isolation, but I don't think it works in this statute, and I really focus on the contrast between paragraphs one and two. Paragraph one uses the phrase with respect to the transportation of property. Paragraph two, with respect to motor vehicles. That seems like a conscious choice that Congress made to parallel the language but change the noun to a much narrower noun. As Mr. Clement observed, transportation has like 24 or 25 different nouns, I think I counted, one of which is motor vehicles. So that suggests that with respect to motor vehicles, must not include things that are with respect to the other stuff in the definition of transportation, one of which is arranging for the movement of property, which is what a broker does. Put it this way. Suppose there were a rule that applied with respect to coffee, cream, and sugar, and then an exception that applied only with respect to coffee. You would naturally think that the exception does not apply with respect to cream and sugar, even though that phrase in isolation might cause you to adopt the opposite view. I think that's kind of what's going on here, and that's why I think Respondent's reading of the statute is the better one. I welcome the Court's questions. Is there any daylight between your argument and that of the Respondent? I don't think so. I think we're aligned on the interpretation of the state statute. With respect to the use or the role of brokers, how significantly has that increased? I agree with what Mr. Boutro said. It has increased markedly. Before the deregulation, there were only several hundred brokers, is my understanding. Today there are approximately 25,000 federally registered brokers operating, from small sizes to as large as C.H. Robinson. What role did the ICC play in regulating transportation in intrastate before deregulation? I don't know exactly the extent of the role. My understanding is that they generally would have thought that intrastate regulation has a substantial effect on interstate commerce, and so to the extent there would be inconsistent rules, as both Mr. Clement and Mr. Boutro mentioned, the Castle case is from the 1960s, I think, and that really exemplifies these things. Illinois there had certain regulations for trucks, but this Court said that Illinois cannot use a violation of those in order to revoke the operating authority, even for the intrastate trucks. Counsel, both the counsel for Respondent and for Petitioner were asked a fair number of questions about B-1. I don't want to evaluate it, but I think they were basically each saying they don't quite know why it's there, and I wonder if the federal government has an answer. I think my answer is that Congress did not view the safety exception as reaching these kinds of claims against brokers and freight forwarders, and so I don't think there is an anomaly, and there certainly isn't if you adopt Respondent's view of the safety exception. Now, what Mr. Clement said, first he said he has no idea, but that's just how it is. He said, regardless of this case, I think he said there's going to be this difference between intrastate and interstate anyway, but I don't think that's correct. The first thing he pointed to was that B does not include the limiting phrase with respect to the transportation of property the way C-1 does, but you don't need that phrase in B because the only entities covered in B are freight forwarders and brokers, and the only thing those guys do is act as middlemen for the transportation of property. That's what they're statutorily defined as being. So you don't need that limitation in B. You do need it in C because it applies to motor carriers, which can have their cars on the road not engaged in interstate transportation of property. So I don't think that works. So I really do think there's a huge anomaly here that Congress in 95, where, you know, we all acknowledge claims against brokers were not preempted before 1995, and then Congress decides in 95 we need to add brokers, and the way they do it is they, as Mr. Clement said, insert them in C and add this provision B, and it just makes no sense whatsoever that a Congress interested in preempting claims against brokers would leave greater state authority over interstate broker services than intrastate. That is so weird. I am unaware of any preemption regime, express, implied, field, conflict, obstacle, whatever, in which that's how it works. It is so bizarre that I think you really should look at the safety exception the way respondents do because that's the only way to do it. Let me ask you a question, Mr. Josie, because I think we could also believe that Congress was really interested in making sure that safety was top of mind, top priority, and the problem, I think, with the argument and the way that you set it up is that you are assuming away any responsibility that a broker might have for safety. Your argument depends, in a way, on us accepting what you said, what Mr. Boutrous said, that brokers are just operating as middlemen. They really don't have anything to do with safety, and I guess I don't understand why we have to believe that Congress shared that view as opposed to Congress thinking, well, to the extent that brokers are involved in safety, that's going to come out in the tort suit as a causation issue, and so we don't really have to take a position on which individual defendants are actually responsible for safety. What we want to do is make sure that safety regulations are preserved, that safety is top of mind for everyone, and if brokers really are the kinds of middlemen that Mr. Boutrous and you say, they're ultimately not going to be held liable because either the state's not going to allow this kind of tort suit on the front end or they're not going to be held liable because they're really not a big player in this from the standpoint of tort law. Why can't – that, to me, is perfectly consistent with the view that petitioners have and make your view seem a little odd. So two responses to that. Well, first, I agree what you just said is consistent with what Mr. Clement said, but obviously I disagree with it. So the two – a couple of statutory points that I think show that Congress, in fact, was thinking that brokers wouldn't be responsible for safety, so they did share the view that Mr. Boutrous and I are advancing today. Number one, on the safety exception, it would have been the easiest thing in the world for Congress to just repeat with respect to transportation, just like it had half a sentence earlier, or just leave it out entirely. Well, wouldn't the easier thing be to say something about brokers in the safety exception? I mean, if you're right and they shared this view that there were certain individuals in the chain who are just not going to fit, then I would think we would see that language in the safety exception, right? Sure. Congress could always be more clear, but what I'm saying is that Congress's choice there suggests that they did not necessarily view it this way, but there's more. There's much more. Congress has an entire – several chapters of the U.S. Code in Title 49 that deal with safety, addressing carriers, safety of motor vehicles, driver qualifications, and they're all addressed at carriers. Not a single one is addressed at brokers. And I'm going to now invoke – they say the exception sometimes proves the rule. In 2012, Congress passed a statute and they added a provision, and that provision makes transportation intermediaries, which I think we all agree includes brokers and freight forwarders, liable, and it says, you know, you should not coerce a driver or a carrier to violate all these numerous safety rules that apply only to carriers and drivers. As a matter of federal law. As a matter of federal law.  And so it's a little bit odd. But what I'm saying is this statute expressly preserves the scope of state safety regulations. So it's no answer, I think, to point out that Congress, under federal law, would not have held these brokers liable. The question is, what were they doing when they said, here we are preserving state ability. Right. No, no. I took your original question to be, why do we think Congress shared the view that brokers would not be responsible for safety? And what I'm saying is the entire federal scheme is set up so that carriers and drivers who, to use tort law terms, are the lowest cost avoider in terms of safety, are responsible for safety, and they have to pledge that they're responsible for safety and obey all the safety rules as a condition of federal registration. And then brokers select from the pool of registered carriers. That makes perfect sense. If, in fact, there is, the federal authorization does require some, does involve some inquiry into the safety of carriers. And do you want to say something about that, how it works as a practical matter? As a practical matter, you're right. And Justice Sotomayor was right earlier. You know, FMCA is understaffed, overworked, can't possibly review the 700,000 federally registered carriers. But every year, or I should say this, of the 700,000 federally registered carriers, the agency has been able to do at least one roadside inspection for two-thirds of those carriers in the last five years. So there is some oversight, not nearly enough. I will grant the point. But carriers who violate their requirements under the statute or the regulations, not only can the agency revoke their operating authority and go after them, there is a federal private cause of action against the carrier who violates the federal requirements that an injured party can bring against the carrier for violating it. In fact, there's one against brokers, too. Now, of course, I'm not going to tell you it's frequently invoked because obviously the federal requirements for brokers don't involve safety, so I don't think there's a lot of federal lawsuits based on it. But Congress did provide these as a means to ensure that carriers and brokers obey federal law. Thank you, Counsel. Justice Thomas? Justice Alito? C-2 wouldn't come into play unless C-1 applies. Could you just say something briefly about why C-1 applies? Yes, because a broker is defined as someone who, you know, I'm looking at 13102 sub 2, the back end of the definition, arranging for transportation by motor carrier. That is literally the service of a broker. And petitioner's tort claim, if successful, would allow enforcement of a common law rule. And the common law rule would say not just that the driver was negligent on this particular occasion, and it wouldn't just say that C.H. Robinson erred in selecting Carrie Bay on that occasion to transport those particular flower pots in December of 2017. Instead, it would say, Carrie Bay, you should not, you should not have, or C.H. Robinson, you should not have hired Carrie Bay at all. And in fact, no broker should ever have hired Carrie Bay to do anything. So it's directly attacking a broker's selection of a carrier, which is the core service, which means it's related to the service of a broker. And that is why every court of appeals, even ones that agree with petitioner, have rejected this claim and have agreed that these sorts of torts fall within C-1. Thank you. Justice Sotomayor? I think you've told Justice Thomas that you agree with everything that Mr. Montgomery is arguing. Is that correct? No, we're on the opposite side from him. I'm sorry, not Mr. Montgomery. What Mr. Carrie? Yeah, we're supporting response. You're agreeing that the safety, they've argued, but I didn't see it in your brief, that the safety exception preserves only state's authority at the time of the action. No, no, that's one where we say, and so I also didn't think that you were agreeing with his implied preemption argument or are you? We're, we're, we don't take a position. So it's not everything. I agree with everything Mr. Boutro said at the lectern today. So right now you would have it that the federal government is not imposing any safety obligations on brokers. And you're saying despite the exemption for safety, with respect to motor vehicles, neither can state. So nobody's checking what they're doing. Brokers are required to pick from among the pool of federally registered carriers. That's what does the work here. Even if someone has had a thousand accidents and it's well known, no brokers are liable. The carriers would be liable for that, but correct. The broker, as long as they still are. I just want to know the end result of your argument. No one's checking. No one's going to be liable. That is, that is, well, carriers are liable, but that is what we think the federal system is, how it's supposed to work. Carriers are responsible for safety. How about shippers? Are you agreeing with your adversary? We have not taken a position on shippers. I don't think, I mean, just standing here at the lectern, it doesn't seem like this statute, covers claims against shippers. Except in so far as through the row against New Hampshire Motor Transport Association there, that was a rule that actually regulated shippers, but it was nonetheless preempted because it affected carrier services. So under that way, perhaps it could, you know, preempt certain types of rules against shippers, but it's sort of hard to see. It's hard to see that a safety one would. I don't know the answer to that. All right. Thank you, frankly. Justice Kagan. You said, okay, if you look at it with respect to motor vehicles, that seems pretty bad for you, but we're going to look further. And the place where you pointed was the definition of transportation. Is that right? And I'm doing this on the fly, so forgive me. You can just tell me if I'm wrong. But you said the key thing about the definition of transportation was that it specifically says that transportation includes services related to arranging for blah, blah, blah, you know, the transport of property. And you said that's what a broker does. So we should think about that as in the other with respect to clause, not in the with respect to motor vehicles clause. Do I have that right? That's right. Okay. So, but that provision also, you know, in addition to saying services related to arranging for transport, it says services related to receipt delivery, transfer in transit, you know, it has all these other verbs in it too, which it seems to me would apply to the motor carriers themselves. So if we want to apply that same theory of the case, we would have to take out the motor carriers from the, with respect to motor vehicles phrase. Maybe, maybe not. I mean, motor carriers are the ones who own and operate the vehicles. And so to the extent, what you're challenging is they're performing those services. I think maybe not, but more to the point, I think most of these claims against drivers are for negligence and those are obviously permitted. They're not preempted and federal law, you know, by operation of federal law and the definition of employee drivers of commercial motor vehicles are deemed to be employees of motor carriers, even if they're independent contractors that that's expressed in the, in the definition. And everyone understands the reason for that is so that motor carriers will always be vicariously liable for the torts of their drivers during the, the scope of employment. That's why you don't see in this complaint, which is in the joint appendix, you don't see a claim against the motor carrier here for negligently selecting the driver. That would be silly. No, no sane plaintiff would bring that claim because you can just say the driver was negligent on this occasion and therefore you are vicariously liable. And that's typically why these claims against motor carriers aren't going to be preempted. I mean, I take that point. All I'm suggesting is that you pointed us to a phrase as being very relevant to you when that phrase includes just about everybody. It's not like a phrase about brokers where you say, Oh look, you know, they meant brokers to be in this provision because this is a phrase about brokers. This is a definition that includes everybody under the sun. That is true. I guess I'm not seeing how relevant it is. So to the question of whether with respect to motor vehicles somehow excludes brokers. So I want to be clear. I, I, I think this particular point I'm making as well as the three other main contextual clues that we've made in the brief, one of which is the interest state. The other is a super fluidity or potential super fluidity. And the third being the financial services requirements, which justice Kavanaugh was discussing earlier. I'm not making a claim that any of those four itself is dispositive and just answers the question. I do think this is a hard case, but I think all four of them tilt in respondents direction and they suggest that with respect to motor vehicles has a narrower effect than it might seem. Dan city supports that reading of with respect to as well. And given that every contextual clue, every oddity, every anomaly respondents reading doesn't produce it. Whereas petitioners does. I think in the end, when you look at all of it, respondents is the better reading. That's our point. I just want to follow up on that a little bit. I take your point that with respect to transportation is a lot broader than with respect to motor vehicles. It's a good point. But once you say that with respect to motor vehicles, doesn't just mean with respect to the mechanics of that vehicle, but can include hiring negligent hiring by the carrier or some negligence by the carrier. Then I wonder why that doesn't also hold for brokers. Yeah. So, so to be clear, the definition of motor vehicle is not just tractor trailer, et cetera, but it also says it has to be and used on a highway and transportation. Sure. Claims about the use count. Okay. And does it say that's my point is once that camel's nose is under the tent and you can have a claim for negligent hiring against the carrier, why not against the bro? No, that, that's my point. As far as I'm aware, there's no such thing as a negligent hiring claim against the carrier because the carrier is vicariously liable for the driver. So it would be by the driver once, once, once you've gotten to the driver. Yeah. Okay. And not just the motor vehicle itself and a negligence in operational or use of the motor vehicle counts. Well, then it counts because it's in the definition. I understand that. I, I'm not arguing with you about that. But once you can see that the use counts and that somebody can be held liable for negligence in the use, then it just seems to me we're talking about causation at that point. I take the point. And obviously that is Mr. Clement's point here today. But my, my point is, I understand as well. I'm sorry to interrupt, but I'll let you answer. I understand as well if there were a strict liability regime or something like that, but once, as long as we have a proximate cause regime and that's all that's before us. All right, now go ahead and answer. Yeah. I mean, I guess, I guess the way I look at it is transportation is really broad and yes, it says motor vehicle is one of them and it's got other stuff that may be closer to motor vehicles, maybe farther away. I think, you know, 20, one three one Oh two 23 a says motor vehicle, vessel, warehouse, et cetera. And then in B it's services related to the movement, including arranging for, and I know how you could see that arranging for the transport of property is kind of related to motor vehicles, but given Congress's choice to use with respect to transportation in one in paragraph one and with respect to motor vehicles and two, that suggests it wants a subset. And the question is what is in that subset and what is out of the subset. And I think arranging for transportation, but once you've gotten this use of the motor vehicle into, right, you say that you, you, you, you, you, you spot them that I'm not arguing with you about that. I, you've, you've given that up fine, but now the use of the motor vehicle, not just the motor vehicle itself, but the use of the motor vehicle can be regulated by the state. Yes. But brokers don't use vehicles, right? Brokers don't control the vehicles. The broker doesn't know when the brakes were last inspected, how thick the tire tread is. Brokers don't even know the safety record of the driver. That's confidential. You have vicarious liability. No, you spot that. No, for carriers, not for brokers. No, I understand. But you spot vicarious liability for carriers. I'm not arguing. Under federal law, it's expressed. I understand that. Okay. I'll stop. I mean, I take the point that this could be, you know, what you described could be a sensible system, but I think given the federal statutes and regulations, I don't think it's what we have today. Thank you, counsel. Justice Kavanaugh. A couple of things you at the beginning said related to, and with respect to are different in your view. Probably. That's not very convincing to me. So I just want to get that out there. I mean, I think for either term, you have to look at the context and common sense to see as Judge Fernandez said in his dissent in the Ninth Circuit, where to draw the line, Paul's graph, et cetera. Yeah, I actually agree completely. I mean, I think the court in Lamar and Archer made the point that. I'm going to move on to my next question if you agree completely. So you say the carriers are liable, so don't worry about it. But one of the problems I think that's led to this is the carriers sometimes can't pay. Yeah. So when we're thinking about context and common sense and figuring out how broadly to read with respect to, isn't that part of the context and common sense? Well, it's the statutory context. So we have to look at it from Congress's perspective and from Congress's  carriers could pay because they were they are required to have the financial security requirements of 750,000. And yes, that was enacted in 1980. I take the point. Maybe it's woefully inadequate. Okay. Two more quick ones. You just said brokers don't know the safety records of the drivers. Yeah. Aren't they going to have to, if the other side prevails in this case, figure out how to get into that? I mean, those are confidential. By virtue of what? By privacy laws and federal law when FMCSA reviews it. So right now, I don't think brokers have a practical way to get it. And what that means is that brokers will, as some of the amicus briefs point out. And as I think Mr. Clement just candidly admitted, acknowledge that brokers are going to follow the, you know, no one ever got fired for buying IBM principle. And they're just going to go to the largest carriers. It's got to be FedEx, UPS, J.B. Hunt, Penske, you know, et cetera. That leads to my last question, which is again, context and common sense. And their position is going to mean fewer truck accidents. There are going to be fewer trucks. There are going to be fewer carriers in the market. Fewer truck accidents where people get killed. And they say because brokers are going to dig in and not hire or arrange with shaky truck drivers. That could well be true. But that would be a result of there being fewer trucks on the road, which means worse interstate commercial motor delivery services. I mean, if Petitioner's tort claim is successful, it's going to take the pool of registered carriers that federal law says brokers can pick between, and it's going to shrink the pool. That is contrary to Congress's deregulatory purpose. Thank you. Justice Barrett? Justice Jackson? I just want to give you a chance to explain as quickly as you can what your surplusage argument is. Because the way you've defined this, you have motor vehicles as a subset, not as the whole thing in terms of the preemption. So why would there be surplusage here? There would be a surplusage on Petitioner's reading of the statute. Petitioner seems to suggest that with respect to just means concern, and it can be a pretty lengthy chain, pretty indirect. I mean, I think Mr. Clement today at the lectern said indirect. He wants it to be interpreted the same as related to in Morales and, you know, the ADA cases, which includes indirect connections. If that's true, then every single thing, as I think Justice Kagan was pointing out, in the definition of transportation, arguably is indirectly related to a motor vehicle, which means that the safety exception, you could glue Petitioner. Sorry, he says with transportation, the property is like grain elevators, so there's nothing to do with the car or with the motor vehicle. He's got transportation of property much broader. I don't know how you get the grain into the elevator or out of the elevator without a motor vehicle. So I would think that on Petitioner's logic, claims about that would also be in. So I think if you take Petitioner's interpretation seriously, then the safety exception basically reads the same if you blue pencil the phrase with respect to motor vehicles out of the statute. Thank you. Thank you, counsel. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, a couple of times my friends on the other side have crept into this alternative theory that really motor vehicles should be limited to owners and operators. Obviously those words aren't in the relevant statutory provisions, and as we point out in the reply brief, as a practical matter, something like 45% of carriers don't actually own the vehicles. They lease them or they belong to the driver. If we're going to talk practicalities, I think one really important number that's practical is that 94% of the registered carriers out there on the roads haven't had any meaningful federal safety inspection, the kind of annual inspection you have. You get the registration, and then hopefully within about a year or so you get the fuller inspection. But 94% of the carriers out there haven't gotten this federal inspection. So it would be really nice if state tort law provided a backstop to a federal system that's not really doing a lot. On the B point, my friend from the Solicitor General's office said, you know, the freight forwarders are just middlemen. That's not actually true, and that's why there is this requirement that they have some personal injury liability insurance. They do do more than the brokers. But the point is brokers aren't just middlemen, at least in many of these cases. I talked about the cases where the carrier is actually captive. All they do is take C.H. Robinson loads. That's all they do. They don't serve any other broker or they don't serve shippers directly. In that situation, C.H. Robinson knows or should know every bit as much as a carrier. The issue of the-and one other point on this is the practicalities of this. There are services out there right now that tell brokers more safety information that's available based on the federal records. C.H. Robinson doesn't want to use those, but other brokers do. Maybe that's why C.H. Robinson is a defendant in more of these cases than some of the other brokers. There's more that brokers can do. There was some discussion of a patchwork. That really doesn't work here, because they concede there's going to be a patchwork with respect to the carriers. And this whole regime on safety allows for a patchwork. The federal safety regulations are expressly designed as a minimum, and states are allowed to go above and beyond the minimum. There was some discussion of this L.B. Foster case, and my friend said, well, that's not such a great case for Mr. Clement because that was an unregistered broker, an unregistered carrier. But the problem is their theory sweeps so broadly that you can't hold a broker liable for negligently hiring a completely unregistered carrier. There are some cases like that, and that just doesn't make any sense whatsoever. That's complete negligence, and there's no reason there would be immunity there. There was some brief discussion of the Castle case. That old chestnut, if you take a look at it, it basically says Illinois can fine drivers for violating their state law. They just can't literally bar them from the state. But this is a situation much more analogous to the fines, that there would be liability. It's going to mean if it's a single company driver, like it might put the carrier out of business. This particular carrier here has dissolved itself as an Indiana corporation, but I think that's probably a good thing, not a bad thing. Some discussion just about how to resolve this case. I would say if you are convinced that we win on C2, then I would urge you not to say anything really definitive about C1. My friend is correct that all the courts that have looked at this particular issue, with the safety exception staring them in the face, have all said that C1 provides preemption. But the hard case is going to be in the ADA context, the hard case is going to be if there ever is a D case, there probably won't because there's so few that are purely intrastate, but the hard case is going to be when you're staring at that preemption clause, and there is no safety exception to sort of back it up. So I would urge you, if you think C2 applies here, just leave C1 for another day. And then I'm sure I missed some of the subtlety of the Solicitor General's officer point about the coffee and the cream and the sugar and all of that, but the thing is, if you have one of these like McDonald's torts where the problem is the piping hot coffee spilled in your lap, I would say that's a tort with respect to coffee. And for the same reasons, this is a tort with respect to motor vehicles. This case doesn't have to be that hard. The thing that triggers state tort liability is an 80,000-pound motor vehicle. That's what devastatingly injured my client. This is a case with respect to motor vehicles. We urge you to reverse. Thank you, Counsel. The case is submitted.